<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TYCO HEALTHCARE GROUP LP and MALLINCKRODT INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 07-1299 (SRC) |
| MUTUAL PHARMACEUTICAL COMPANY, INC. and UNITED RESEARCH LABORATORIES, INC., | **OPINION & ORDER** |
| Defendants. | |

<u>**CHESLER**</u>, **U.S.D.J.**

This matter comes before the Court on the motion for partial summary judgment by Plaintiffs Tyco Healthcare Group LP and Mallinckrodt Inc. (collectively, "Tyco"). The Defendants are Mutual Pharmaceutical Company, Inc. and United Research Laboratories, Inc. (collectively, "Mutual"). For the reasons stated below, the motion for partial summary judgment will be granted in part and denied in part.

<u>**BACKGROUND**</u>

This case arises out of an action for patent infringement, which has been described in previous Opinions and need not be repeated here. The instant motion concerns the Fifth through Tenth Count of the Counterclaims in the Third Amended Answer. These Counterclaims are: 1) Fifth - inequitable conduct; 2) Sixth - unlawful attempted monopolization in violation of the Sherman Act; 3) Seventh - unlawful monopolization in violation of the Sherman Act; 4) Eighth -

common law unfair competition; 5) Ninth - attempted monopolization in violation of the New Jersey Antitrust Act; and 6) Tenth - monopolization in violation of the New Jersey Antitrust Act. Specifically, the motion for partial summary judgment seeks judgment on the availability of the sham litigation exception and the Walker Process fraud exception to Noerr-Pennington immunity in regard to these claims.

## APPLICABLE LEGAL STANDARDS

### I. Motion for summary judgment

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith

respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set out specific facts showing a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

## ANALYSIS

**I.    Plaintiffs' motion for partial summary judgment**

Plaintiffs move for partial summary judgment on the availability of two exceptions to the principle of Noerr-Pennington immunity in regard to Mutuals' counterclaims which assert violations of antitrust laws. In brief, the counterclaims assert various kinds of anticompetitive conduct. The parties do not dispute the relevant basic legal principles. Under the doctrine known as Noerr-Pennington immunity, a private party is shielded from antitust liability under the Sherman Act when petitioning the government for the enforcement of laws. Eastern R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961). The parties also agree on two exceptions to this rule, the sham litigation exception and the Walker Process fraud exception. As stated by the Federal Circuit:

> A patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965), or (2) that the infringement suit was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).

Nobelpharma Ab v. Implant Innovations, 141 F.3d 1059, 1068 (Fed. Cir. 1998).

Under the sham exception, Noerr-Pennington immunity does not shield activity which is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor ." Noerr, 365 U.S. at 144. In Prof'l Real Estate Investors v. Columbia Pictures Indus., 508 U.S. 49, 60-61 (1993) (citations omitted) ("PRE"), the Supreme Court established a two-part test to determine whether the sham exception applies:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use [of] the governmental process -- as opposed to the outcome of that process -- as an anticompetitive weapon. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

Plaintiffs contend that Mutual cannot prove that the instant patent infringement litigation is a sham under an objective standard.

The dispute between the parties over the sham exception turns on the determination of whether the patent infringement suit was "reasonably calculated to elicit a favorable outcome." Mutual argues, in brief, that, as this Court held in the Opinion of August 4, 2009, under the Federal Circuit's decision in Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1248 (Fed. Cir. 2000), a product manufactured to the specifications contained in Mutual's ANDA could not literally infringe the patent at issue. Mutual argues that, prior to initiating this litigation, Plaintiffs knew about Elan, the ANDA, and the patent, and could not have therefore reasonably believed that their patent infringement claim could succeed.

Defendants appear to suggest that it was obvious that Elan was the relevant controlling authority and that, applied to the facts of this case, this Court's conclusions should have been expected. The Court finds it curious that, if this was so obvious, Defendants never moved for summary judgment of non-infringement on that theory. It is only from the perspective of the rear view mirror, however, that Elan's controlling significance is clear. There is no reason to believe

5

that it should have been so clear in 2007. At that point, what was known to Plaintiffs was that the ANDA and the patents referred to methods of measuring SSA that were not identical. (See Defs.' Resp. 56.1 Stmt. ¶¶ 11-16.) This fact alone is sufficient to raise the possibility that a court would not conclude that Elan precluded a finding of infringement. Uncertainties over these factual issues made the applicability of Elan unclear.

In reply, Plaintiffs point out that PRE requires an antitrust plaintiff to prove that the antitrust defendant lacked probable cause to initiate suit. PRE, 508 U.S. at 62. "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that [a] claim may be held valid upon adjudication." Id. at 62-63.

Moreover, Plaintiffs contend, the facts do not support Mutual's characterization of Plaintiffs' patent infringement claims as obviously impossible. Plaintiffs point to evidence that: 1) measurement of particle surface area is dependent on the measurement method used; 2) Mutual's ANDA used a measurement method different from that used by Tyco; and 3) Tyco had no access to any sample of Mutual's generic temazepam to test at the time that the period for filing the patent infringement suit pursuant to Hatch-Waxman had expired.

As Plaintiffs note, on July 29, 2009, this Court held a preliminary injunction hearing at which both parties had experts testify about the effect of the particle surface area measurement method on the measurement. And, as Plaintiffs also note, in the Opinion of August 4, 2009, this Court stated:

> At the hearing, Dr. Luk testified that the SSA test should be performed with outgassing at 105ºC, not 40ºC. In opposition, Dr. Williams testified that the SSA test should be performed with outgassing at 40ºC, not 105ºC. The parties appear not to dispute that the samples manifest an infringing SSA when tested with outgassing at 105ºC, but a noninfringing SSA when tested with outgassing at

> 40ºC.
>
> Thus, were this Court to agree that the infringement analysis at this juncture should be based on product samples rather than ANDA specifications, this Court would have before it a factual dispute between experts on an obscure scientific point, the temperature at which outgassing should be conducted in a particular chemical analysis. Such a factual dispute would likely need to be resolved at trial by a battle of the experts. At the preliminary injunction hearing, this Court heard detailed testimony from each party's expert. Tyco's expert, Dr. Luk, did not persuasively articulate a basis for selecting 105ºC as the proper outgassing temperature. This Court observes that, according to Dr. Luk, Tyco never actually conducted any tests at 40ºC. Dr. Luk rejected Dr. Williams' tests at 40ºC solely because he viewed the variation in results as evidence of unreliability in the testing methodology. Dr. Williams, on the other hand, not only tested Mutual's proposed product at a wide range of temperatures, but also tested the Sandoz temazepam product at the same range. (Williams 7/22/09 Decl. ¶ 18.) The results suggested to Dr. Williams that increasing the outgassing temperature had no significant effect on the measured surface area of the Sandoz temazepam, but caused a substantial decrease in the measured surface area of the Mutual temazepam. (Id.) This Court found Dr. Williams' opinion to be based on more comprehensive study and therefore more persuasive and deserving of greater weight.
>
> Having heard the evidence at the preliminary injunction hearing, and having weighed it, this Court does not find Tyco's evidence sufficiently persuasive to conclude that Tyco is likely to prove infringement by a preponderance of the evidence at trial. To the contrary, this Court found that Mutual's expert raised substantial questions about the strength of Tyco's infringement case. Dr. Williams cited a number of bases for his conclusion that Tyco's SSA measurements were inaccurate because the outgassing temperature changed the SSA of the particles being tested. Dr. Williams' testimony also constitutes substantial evidence that Mutual's SSA measurement method gives accurate results.

(Opinion of August 4, 2009 at 8-9.) If anything is clear from this, it is that the method to be used for the measurement of the particle surface area of temazepam is a subject on which scientific experts could and did disagree.

In their responsive L. Civ. R. 56.1 statement, Defendants concede that they needed to get multiple SSA measurements done on multiple batches of temazepam before they got a batch of

temazepam that met the specifications of the ANDA. (Defs.' 56.1 Stmt. ¶¶ 25-35.) Defendants admit that, on three occasions, the testing laboratory obtained measurements of the SSA of the temazepam sample that fell within the SSA range specified in the patent at issue. (Id. at ¶ 33.) In view of these concessions, it is clear, as Plaintiffs contend, that SSA measurement is far from being a straightforward matter.

As the parties have noted in their arguments, this Court ultimately concluded that Defendants' ANDA unambiguously specifies a non-infringing SSA and thus mandates a finding of non-infringement. Nonetheless, "a court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." PRE, 508 U.S. at 61 n.5.

Rather, as Plaintiffs have strenuously argued, Plaintiffs are entitled to summary judgment unless Defendants have demonstrated a contested issue of material fact concerning whether or not Plaintiffs had a "reasonable belief that there is a chance that [a] claim may be held valid upon adjudication." Id. at 62-63. In the context of the infringement issues in this case, PRE would require summary judgment for Plaintiffs unless Defendants demonstrate that there is a contested issue of material fact as to whether Plaintiffs had a reasonable belief that there was a *chance* that Elan would not control the outcome of this case. "The existence of probable cause— e.g., where the law is unsettled, the action is arguably warranted by existing law, or there is an objectively good faith argument for extending existing law—precludes a sham litigation finding." ERBE Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1292 (Fed. Cir. 2010). At the time the Complaint was filed, a reasonable litigant could have reasonably believed that Elan might not determine the outcome of the infringement action.

8

Defendants bear the burden of proof that the patent infringement claims are sham litigation to cover anticompetitive activity, and they must first show that the claims are objectively meritless. As the party moving for summary judgment who does not bear the burden of proof at trial, Plaintiffs satisfy their initial summary judgment burden by pointing to the absence of evidence to support Defendants' case, and the burden then shifts to Defendants to point to evidence sufficient to prove their case at trial. Defendants have failed to do so. On the present record, this Court finds no disputes over any of the underlying predicate facts, and this Court decides probable cause as a matter of law. PRE, 508 U.S. at 63. Defendants have failed to point to evidence sufficient to persuade this Court that Plaintiffs lacked probable cause to bring a patent infringement suit. Defendants have therefore failed to defeat Plaintiffs' motion for summary judgment as to the sham litigation exception to Noerr-Pennington immunity.

Defendants next argue that no reasonable litigant could have expected that the Tyco patents could withstand its obviousness and inventorship challenges. This is a surprising argument, given the presumption of validity of an issued patent and a challenger's burden of proof of invalidity by clear and convincing evidence. Defendants, however, overlook the clear and convincing evidence standard, and dismiss the presumption of validity argument with an undiscussed citation to a 1984 Ninth Circuit case, which stands for the unremarkable proposition that a patentee who files a patent infringement suit knowing the patent to be invalid acts in bad faith. Handgards, Inc. v. Ethicon, Inc., 743 F.2d 1282, 1289 (9th Cir. 1984). Defendants have simply failed to submit evidence sufficient to demonstrate a material factual question about whether Plaintiffs objectively had a reasonable basis to believe that they had a *chance* to succeed, given the presumption of validity. All Defendants have shown is that Plaintiffs had notice of

9

issues which could be raised, and were raised, by Defendants, including the issue of obviousness on which Defendants ultimately prevailed. Defendants have not, however, engaged in a serious effort to demonstrate that Plaintiffs lacked probable cause to believe that they were asserting valid patents, particularly given that Plaintiffs were not the original patentees and merely acquired the patents from another pharmaceutical company.

Defendants argue as well that Tyco's "Citizen's Petition" to the FDA was a sham. Defendants' very brief treatment of this argument does not explain its legal basis, nor cite any authority regarding non-litigation petitions. The opposition brief's "Legal Standards" section references only Noerr and PRE, and PRE is inapposite because it is expressly limited to litigation, and a citizen's petition to the FDA is not litigation. 508 U.S. at 51. It is true that Noerr-Pennington immunity does not shield activity which is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."[1] Noerr, 365 U.S. at 144. Defendants assert only that the petition was a sham, and say nothing to support an inference that it was an attempt to interfere directly with the business relationships of a competitor. Rather, Defendants try to stand the law on its head and shift the burden of proof here to Plaintiffs, arguing that Plaintiffs have failed to show that it was not a sham. This does not fly. Defendants bear the burden of proof here, and they have not met it.

---

[1] Defendants fail to even articulate, much less justify, the legal standard that this Court should apply to non-litigation petitions. Certainly the Supreme Court's decision in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972), and its discussion of that decision in PRE, 508 U.S. at 58, and City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 382 (1991), are highly relevant. In Motor Transport, the Court stated that it was difficult to draw the line between legitimate petitions to administrative agencies and violations of the antitrust laws, and that cases of "abuse" of administrative processes should not acquire immunity. 404 U.S. at 513. Defendants have neither argued nor presented evidence which would support an inference that, in filing the Citizen's Petition, Plaintiffs abused the administrative process.

Moreover, this Court will not allow a party to defeat a motion for summary judgment by tossing out a fragment of a legal theory. To defeat a motion for summary judgment, the nonmovant with the burden of proof must show that there is a genuine issue for trial. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Assuming that any factual questions are resolved in Defendants' favor, Defendants have not shown that, applying the law to the facts, they could prevail at trial on the issue of whether the Citizen's Petition was a sham. As to the Citizen's Petition, Defendants have failed to defeat Plaintiffs' motion for summary judgment, which will be granted.

As to the Walker Process fraud exception, Defendants must prove that "the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*." Nobelpharma, 141 F.3d at 1068. "The Supreme Court in *Walker Process* . . . held that antitrust liability may attach when a party uses a patent to obtain or preserve a monopoly if the patent was procured through intentional fraud on the Patent and Trademark Office." Ritz Camera & Image, LLC v. Sandisk Corp., 700 F.3d 503, 505 (Fed. Cir. 2012). In deciding this question, this Court applies the law of the Federal Circuit. Nobelpharma, 141 F.3d at 1067. Here, again, Plaintiffs satisfy their initial summary judgment burden by pointing to the absence of evidence to prove Defendants' case, and the burden then shifts to Defendants.

"The plaintiff in the patent infringement suit must also have been aware of the fraud when bringing suit." Nobelpharma, 141 F.3d at 1069. Indeed, Defendants contend that Tyco knew that the patents were obtained through fraud. Mutual's case on this point is simply that Tyco, when it purchased the patents from Sandoz, had done a due diligence investigation and had

11

reviewed the patents' prosecution histories.

This evidence is not sufficient to persuade a reasonable finder of fact that Plaintiffs knew that the patents had been procured by knowing and willful fraud. The Federal Circuit has held that a showing of fraud for the purpose of antitrust violation involves "a rigorous standard of deceit:"

> [T]he road to the Patent Office is so tortuous and patent litigation is usually so complex, that 'knowing and willful fraud' as the term is used in *Walker* can mean no less than clear, convincing proof of intentional fraud involving affirmative dishonesty, a deliberately planned and carefully executed scheme to defraud the Patent Office.

C.R. Bard v. M3 Sys., 157 F.3d 1340, 1364 (Fed. Cir. 1998) (quoting Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 996 (9th Cir. 1979)). Thus, Defendants must point to evidence that, as of March 20, 2007, the date that Plaintiffs filed the Complaint, Plaintiffs knew that Sandoz had procured the patents through a deliberately planned and carefully executed scheme to defraud the Patent Office.

Defendants' evidence falls far short of this. Defendants point to evidence supporting two factual assertions: 1) Plaintiffs had read the patents' prosecution histories; and 2) Plaintiffs knew of the "Memo for the Record" (the "Memo"). This does not amount to even a mere scintilla of evidence that Plaintiffs knew of a deliberately planned and carefully executed scheme to defraud the Patent Office. This Court does not see how either the prosecution histories or the Memo reveal a fraudulent scheme. Certainly it makes no sense to suggest that the prosecution histories themselves reveal such a scheme, as surely the PTO would have noticed and refused to grant the patents.

As for the Memo, Defendants point to two statements in it: 1) the statement that Dr.

Leber of the FDA stated that "a dose lower than 30mg may be appropriate for the more common, transient forms of insomnia" (Hedemann Decl. Ex. H at MI 085564); and 2) the statement that Dr. Lee of the FDA stated that, "in Great Britain, temazepam doses from 5-15mg are recommended for geriatrics" (Id. at MI 085565). The report of Dr. Leber's speculation about dosages below 30mg appears to be of no significance.[2] The report of Dr. Lee's statement has some significance, but it is evidence suggesting at most that the patents might be vulnerable to a validity challenge.[3] It is not, however, evidence that Sandoz engaged in a deliberately planned and carefully executed scheme to defraud the Patent Office, nor is it evidence that Plaintiffs knew that the patents had been procured through such a fraudulent scheme. Defendants have failed to point to even a scintilla of evidence that Plaintiffs knew at the time they initiated this suit that they were seeking to enforce patents which had been procured by knowing and willful fraud, within the meaning of Walker Process. There is simply no basis in the record to support this assertion. At most, the evidence supports the inference that Plaintiffs were aware that relevant prior art existed that could impact the validity or enforceability of the patents.

    Moreover, the Federal Circuit has stated:

> *Walker Process* fraud is a variant of common law fraud, and that the elements of common law fraud include:(1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his

---

[2] Defendants appear to suggest that this shows that Dr. Leber is the true inventor of the 7.5mg dosage. That is quite a leap from the evidence.

[3] A reasonable finder of fact could infer from this evidence that Plaintiffs knew at the time they filed the infringement claims that the patents might have validity vulnerabilities, but not they knew that the patents had been procured by knowing and willful fraud.

13

reliance on the misrepresentation.

<u>Unitherm Food Sys. v. Swift-Eckrich, Inc.</u>, 375 F.3d 1341, 1358 (Fed. Cir. 2004) (citations omitted).  Under this standard, the applicant's alleged omissions could conceivably meet the standard of "but for" causation.  This is a far cry, however, from demonstrating that Plaintiffs knew that Sandoz had engaged in a deliberately planned and carefully executed scheme to defraud the Patent Office.

Plaintiffs have moved for summary judgment on the Fifth through Tenth counterclaims. The Fifth Count of the counterclaims, asserting inequitable conduct, is clearly not impacted by the Noerr-Pennington analysis, and, as to the Fifth Count of the counterclaims, the motion for partial summary judgment will be denied.  As to the Sixth and Seventh Counts of the counterclaims, asserting violations of the Sherman Act, this Court finds that Noerr-Pennington immunity bars those claims, and, as to these claims, the motion for partial summary judgment will be granted.  Plaintiffs cite <u>Patel v. Soriano</u>, 369 N.J. Super. 192, 233 (N.J. Super. Ct. App. Div. 2004), as authority for the proposition that New Jersey recognizes all defenses available under the federal antitrust statutes as defenses to analogous state law claims.  Defendants have not contested this, and so, as to the Ninth and Tenth Counts of the counterclaims, this Court finds that Noerr-Pennington immunity bars those claims, and, as to these claims, the motion for partial summary judgment will be granted.  As to the Eighth Count of the counterclaims, for common law unfair competition, although <u>Patel</u> distinguishes New Jersey's antitrust statutory law from the common law of unfair competition, Defendants have not argued that Noerr-Pennington immunity is inapplicable, and this Court understands Defendants to have conceded that Noerr-Pennington immunity may bar their unfair competition claim.  Thus, as to the Eighth Count of the

counterclaims, this Court finds that Noerr-Pennington immunity bars that claim, and, as to that claim, the motion for partial summary judgment will be granted.

As to the issues of the availability of the sham litigation exception and the Walker Process fraud exception to Noerr-Pennington immunity in regard to the Fifth through Tenth counterclaims, Plaintiffs' motion for partial summary judgment will be granted in part and denied in part. As to the Fifth Count, the motion will be denied; as to the remaining counts at issue, the motion will be granted.

For these reasons,

**IT IS** on this 18th day of January, 2013

**ORDERED** that Plaintiffs' motion for partial summary judgment (Docket Entry No. 461) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that, as to the Fifth Count of the counterclaims in the Third Amended Answer, the motion will be **DENIED**; and it is further

**ORDERED** that, as to the Sixth, Seventh, Eighth, Ninth and Tenth Counts of the counterclaims in the Third Amended Answer, the motion will be **GRANTED**, and Judgment will be entered in favor of Plaintiffs on those counts.

    s/ Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.